UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID MELLOR and | * | |
| DENISE MELLOR, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | Civil Action No. 1:21-cv-10319-IT |
| v. | * | |
| | * | |
| JETBLUE AIRWAYS CORPORATION, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

September 29, 2023

TALWANI, D.J.

Plaintiffs David and Denise Mellor brought this action against Defendant JetBlue

Airways Corporation ("JetBlue") alleging that David Mellor sustained injuries when an overhead

bin door detached and struck him during a JetBlue flight. Pending before the court is JetBlue's

Motion for Summary Judgment ("Motion") [Doc. No. 41]. For the following reasons, the Motion

[Doc. No. 41] is DENIED.

**I.  Factual Background**

**A.  *The Incident***

On February 9, 2018, the Mellors were passengers on a JetBlue A320-232 aircraft.

Plaintiffs' Response to Defendant's Statement of Material Facts ("Pls.' Resp. Def.'s SOMF")

¶¶ 2, 41 [Doc. No. 47]. David Mellor was seated in aisle seat 3D and Denise Mellor was seated

in window seat 3F. Plaintiffs' Response to Defendant's Requests for Admission ("Pls.' Resp.

Def.'s Req. Admis.") ¶¶ 8-9 [Doc. No. 37-4].

Prior to the flight beginning its final descent, the passenger cabin overhead bin door above

row 3 seats DEF (the "bin door") was shut, as required by JetBlue's Flight Attendant Manual for

the aircraft. Defendant's Statement of Material Facts ("Def.'s SOMF"), Att. 17 (JetBlue Flight

Attendant Manual) 4 [Doc. No. 42-17]; Pls.' Resp. Def.'s SOMF ¶¶ 42, 44, 45 [Doc. No. 47].

During the descent, another passenger stood up and unlatched the bin door. Id. at ¶¶ 47-48 [Doc.

No. 47]; Plaintiffs' Statement of Material Facts ("Pls.' SOMF") ¶¶ 4-5 [Doc. No. 48]. After the

bin door was unlatched, it detached and fell, striking David Mellor on the way down. Pls.'

SOMF ¶¶ 5-6 [Doc. No. 48].[1]

Following the incident, the flight attendant "put the bin door back in the hinges," and the

remainder of the flight was completed without incident. Id. at ¶ 6.

### B.  *Doors, Bins, Hinges, and Splines*

An overhead bin door on an Airbus A320 attaches to a bin compartment via two hinge

assemblies, which connect at the top inside corners of the bin door and the top front corners of

the bin compartment. Pls.' Resp. Def.'s SOMF ¶ 14 [Doc. No. 47]; see Def.'s SOMF, Ex. 19

(JetBlue Aviation Maintenance Manual (AMM) Task Card 25-24-41-400-002-A) ("Bin Door

Installation Task Card")) 6 [Doc. No. 42-19]. Each hinge assembly has three major functional

components, referred to by the parties as a "male component" (which is mounted on the door), a

"female component" (which is mounted inside the bin), and a "spline." Pls.' Resp. Def.'s SOMF

¶¶ 15, 18 [Doc. No. 47].

The male components are screwed into holes on either side of the inside of the bin door,

with each component consisting of the requisite mounting hardware, the hinge, and a stem. See

---

[1] Defendant argues that the bin door did not detach and fall, and that David Mellor was struck by an object that fell from the bin compartment, not the bin door. Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") 6 [Doc. No. 43]. This dispute is not material to the issue presented in Defendant's summary judgment motion, and for purposes of the motion, the court accepts Plaintiffs' version of these events, namely, that the bin door separated entirely from the bin compartment.

id.; Pls.' SOMF, Ex. K (Affidavit of Daniel W. Allison ("Allison Aff.")) 14 (picture of one hinge assembly) [Doc. No. 48-11]; Def.'s SOMF, Ex. 14 (JetBlue AMM Task Card 25-24-00-710-001-A ("Adjustment Task Card")) 5 [Doc. No. 42-14]; id., Ex. 19 (Bin Door Installation Task Card) 6 [Doc. No. 42-19]. Each stem has four downward pointing protrusions; the parties refer to the four protrusions as "teeth." Pls.' Resp. Def.'s SOMF ¶ 17 [Doc. No. 47]; see Def.'s SOMF, Ex. 8 (Affidavit of Anthony S. Janco ("Janco Aff.")) 21-22 [Doc. No. 42-8]. Each stem also has a small hole near its tip. See Janco Aff. at 21-22; Def.'s SOMF, Ex. 19 (Bin Door Installation Task Card) 3 [Doc. No. 42-19].

The female component consists of mounting hardware with a receiver that is open on both ends. See Pls.' Resp. Def.'s SOMF ¶15 [Doc. No. 47]; Pls.' SOMF, Ex. K (Allison Aff.) 14 (picture of one hinge assembly) [Doc. No. 48-11]; Def.'s SOMF, Ex. 19 (Adjustment Task Card) 5 [Doc. No. 42-14]; id., Ex. 19 (Bin Door Installation Task Card) 6 [Doc. No. 42-19].[2] The bottom (upward facing side) of the receiver has four indents, which the parties refer to as "teeth receivers." See id., Ex. 8 (Janco Aff.) 21-22 [Doc. No. 42-8].

Once the stem of the male component (which is mounted to the door) is inserted into the receiver of the female component (which is mounted on the top of the bin), the four teeth on the stem can seat in the four indents of the receiver. Pls.' Resp. Def.'s SOMF ¶ 17 [Doc. No. 47]. A plastic spline is then wedged into the female component from the rear, ensuring that the stem's teeth will stay seated in the receiver's indents. Id. at ¶¶18-20 [Doc. No. 47]; Plaintiffs' Memorandum Opposing Defendant's Motion for Summary Judgment ("Pls.' Mem. Opp.") 6 [Doc. No. 49]. The plastic spline contains a pin which "clicks" into the hole on the tip of the

---

[2] The Bin Door Installation Task Card does not describe the procedure for mounting the female components in the bin compartment.

stem when the spline is securely seated. Pls.' Mem. 5 [Doc. No. 49]; accord Def.'s SOMF, Ex. 19 (Bin Door Installation Task Card) 3 [Doc. No. 42-19]. In its proper, airworthy condition, the stems have been inserted into the receivers, the splines have been inserted into the same receivers from the rear, and the splines' pins have securely "clicked" into the stems' holes. See Def.'s SOMF, Ex. 9 (Installation Task Card) 3 [Doc. No. 42-9]; Pls.' SOMF, Ex. K (Allison Aff.), Aff. Ex. A 4 (photograph of hinge) [Doc. No. 48-11].

Alternatively, if the hinges on the overhead bin door are not securely attached by fully inserted splines with locking pins in the hinge-locking position, the aircraft is not airworthy. Pls.' SOMF ¶ 23 [Doc. No. 48]; Pls.' SOMF, Ex. I (Deposition of Anthony S. Janco) 31:18-23 [Doc. No. 48-13].

### C. Maintenance and Inspection Procedures

JetBlue's Continuous Airworthiness Maintenance Program ("CAMP") is approved by the Federal Aviation Administration ("FAA") and includes an A320-232 Maintenance Program as well as a General Maintenance Manual. Together, these dictate the maintenance procedures JetBlue must follow in maintaining an A320-232 aircraft specifically, as well as general maintenance procedures. Pls.' Resp. Def.'s SOMF ¶¶ 5-6 [Doc. No. 47].

When a maintenance action is taken, a Federal Aviation Regulation ("FAR"), 14 C.F.R. § 121.709(a), requires that carriers document that aircraft are returned to an airworthy condition in aircraft maintenance logs.[3] Section 121.709(b) details the requirements for aircraft maintenance log entries, including that they be prepared in accordance with the carrier's maintenance manual. The section also directs that the carrier may certify that appropriate and

---

[3] JetBlue also refers to the aircraft maintenance log as "MX-3" in JetBlue's maintenance publications. See, e.g., Pls.' SOMF, Ex. N (JetBlue Maintenance Forms Manual) 1 [Doc. No. 48-14].

compliant work was performed through the signature of an authorized certified mechanic or repairman, rather than providing detailed reports of all repairs, so long as the airline's maintenance manual incorporates the authorization. See 14 C.F.R. § 121.709(e). JetBlue's manual contains such an authorization. Def.'s SOMF, Ex. 6 (General Maintenance Manual) 1 [Doc. No. 42-6].

JetBlue also has a Maintenance Forms Manual which provides instructions for completing entries in an aircraft maintenance log. Pls.' SOMF, Ex. N (JetBlue Maintenance Forms Manual) 1-3 [Doc. No. 48-14]. The instructions for the "Defect" section of the form direct that the person originating the entry (marked P for pilot, M for maintenance, or I for informational) "[e]nter a full description of symptoms or characteristics of the defect including position if applicable." Id. A JetBlue crewmember or contract maintenance provider (referred to interchangeably as a "mechanic," "maintenance person," or "repairman") must enter the defect into the maintenance system and "[e]nter the description of the resolved action or deferral details." Id. If the action is deferred, a maintenance defect deferral record ("MDDR") is entered. Id. The instructions direct further that the mechanic shall "[i]nclude AMM reference when applicable." Id.[4]

JetBlue's CAMP requires a visual Cabin Condition Check every 750 hours of aircraft operation. Def.'s SOMF, Ex. 8 (Janco Aff.) ¶ 17 [Doc. No. 42-8]. This procedure requires a technician to perform an inspection of the cabin, including checking that the overhead storage compartments unlatch and close properly and the bin doors are in alignment with each other.

---

[4] The Instructions also direct entry of an "ATA Code." Id. The Air Transport Association of America ("ATA") has developed a code system to provide standardized numeric nomenclature for referring to parts of an aircraft and other terms. Here, the parties do not provide further information regarding these codes. Accordingly, the court does not reference the ATA codes further.

Def.'s SOMF, Ex. 11 (Task Card No. A320-25-20-00-200-900-A) [Doc. No. 42-11]. The cabin check also requires the technician to conduct a visual inspection of the overhead bin doors and compartments and check for "condition and security." Id. at 6. The procedure directs that "minor damage such as small holes, dents, or gouges are permitted" as to bin compartments, but "[n]o damage such as holes, dents, gouges or paint peeling are permitted" as to bin doors. Id.

### D. Maintenance History of the Bin over Seats 3 DEF and Cabin Condition Check

The Aircraft Maintenance Log for the JetBlue A320-232 aircraft that is the subject of this action has six Defect entries relating to the bin over seats 3 DEF in the six months preceding the incident that injured David Mellor, and one Defect entry immediately after the incident. Pls.' SOMF ¶ 1 [Doc. No. 48]; id., Ex. A (Air. Maint. Log) 2-9 [Doc. No. 48-1]. Each of the Defect entries included the requisite signatures. Id., Ex. A (Air. Maint. Log) [Doc. No. 48-1].

The first Defect entry is from July 30, 2017. Id. at 2. The defect was recorded by the pilot in the Aircraft Maintenance Log as, "Overhead bin door at row three, a/c right is off the track," and the repairman recorded the resolution as, "Secured overhead bin as required ops chk good. a/c ok for svc." Id. No specific maintenance manual procedure was cited by the repairman. Id.

The second defect was on August 26, 2017, and has two associated entries in the Aircraft Maintenance Log. Id. at 3-4. In the first, the pilot recorded the defect as, "Overhead bin door 3 DEF fell off." Id. The maintenance provider recorded "Item placed on MEL 25-28-01.[5] A CAT C M procedure complied with. Placard installed. MX4 updated. Notified MCC. Re-installed door and secured closed." Id. The maintenance provider also entered an MDDR number indicating that maintenance was deferred. Id. Later that day, another maintenance action was initiated for the same door. In the second entry, a maintenance provider reported the defect by referencing the

---

[5] The record does not indicate what "25-28-01" refers to.

referral number from the prior entry and "3&4 DEF o/h bin," and recorded the resolution as, "Adj. Overhead bin @ 3 & 4 DEF IAW AMM. 25-24-00 ok for svc. MDDR clr'd. MX4 updated." Id.[6]

Next, on October 3, 2017, the pilot recorded a defect in the Aircraft Maintenance Log as, "Bin 3 (ac right) broken," and a repairman recorded the resolution as, "Resecured the bin at row 3 DEF as required." Id. at 5. No specific procedure was cited.

On December 9, 2017, a pilot recorded a defect in the Aircraft Maintenance Log as, "Bin door 3 row right side came loose," and the maintenance provider recorded the resolution as, "Re-attached overhead bin door above 3 DEF as required. Op ck good." Id. at 6. No specific procedure was cited for the resolution.

On December 18, 2017, a pilot recorded a defect in the Aircraft Maintenance Log as, "Hinge for door panel on overhead cabin bin above passenger seats row 3 + row 4 is detached," and the mechanic recorded the resolution as, "Resecured bin door latch @ row 3-4 r/h side. Ops checks good." Id. at 7. No specific procedure was cited for the resolution.

On December 30, 2017, a pilot recorded a defect in the Aircraft Maintenance Log as, "Overhead bin over 3 DEF fell off hinge," and the maintenance provider entered the resolution as, "Overhead bin resecured IAW 25-24-00." Id. at 8.[7]

Following these six maintenance actions, a Cabin Condition Check was completed on the aircraft on January 6, 2018. That check included a visual inspection of the overhead stowage

---

[6] Task 25-24-00 sets forth the adjustment procedure which deals with, inter alia, adjusting the alignment of the doors, the gap between doors, the door opening angle, and the door hinge. Def.'s SOMF, Ex. 14 (Adjustment Task Card) 4-5 [Doc. No. 42-14]. This procedure is used to re-align the door laterally or vertically, adjust its depth, or to tighten components that have become loose. See id. In all cases, the steps include "open[ing] the applicable door," and tightening screws. Id.

[7] As noted above, Task 25-24-00 sets forth the bin door adjustment procedure.

compartments and reported no discrepancies. Def.'s SOMF, Ex. 15 (Work Order #892005) 1 [Doc. No. 42-15]; id., Ex. 16 (Aircraft Maintenance Log entry dated January 6th, 2018) 1 [Doc. No. 42-16]; id., Ex. 11 (JetBlue AMM Task Card 25-20-00-200-900-A ("Cabin Condition Check")) 6 [Doc. No. 42-11].

There were no other maintenance actions associated with the door until immediately after the February 9, 2018 incident occurred. Following the incident, in a February 10, 2018 Defect entry in the Aircraft Maintenance Log, the flight's Captain wrote, "Bin 3 above DEF needs adjustment." Pls.' SOMF ¶ 7 [Doc. No. 48]; id., Ex. A (Air. Maint. Log) 9 [Doc. No. 48-1]. JetBlue mechanic James LaRosa recorded the resolution in the Aircraft Maintenance Log, "Re-secured ovhd bin door per MM 25-24-41[8]." Pls.' SOMF ¶ 8 [Doc. No. 48]; id., Ex. A (Air. Maint. Log) 9 [Doc. No. 48-1].[9]

JetBlue performed a 750-hour Cabin Condition Check on the subject aircraft on January 6, 2018. Def.'s SOMF, Ex. 16 (Aircraft Maintenance Log entry dated January 6, 2018) 1 [Doc. No. 42-16].

---

[8] Task 25-24-41 sets forth the installation procedure for bin doors, which involves, inter alia, checking that hinge component parts are in "correct condition," putting the door in position in the housings, pushing the splines back in the housings, ensuring splines are "fully engaged" by "hear[ing] a click," and "[m]ak[ing] sure that the pins [] are correctly engaged to the holes." Def.'s SOMF, Ex. 19 (Bin Door Installation Task Card) 3 [Doc. No. 42-19].

[9] Plaintiffs also offer a maintenance log from February 17, 2018, one week after the subject incident. In that log, the pilot recorded that the overhead bin door hinge above seat 3D was broken, and the maintenance provider recorded "[i]nstalled hinge on ovhd bin door as req'd. Checks ok." Pls.' SOMF, Ex. G (Feb. 17 Air. Maint. Log) [Doc. No. 48-7]. The parties dispute whether this resolution involved a spline, but, either way, it occurred a week after the accident. Where there may have been intervening events, the court does not consider this last log in determining what a jury could reasonably find as to JetBlue's alleged negligence.

## II.  Procedural Background

Plaintiffs filed this action in the Superior Court of Suffolk County, Massachusetts, on December 28, 2020. Notice of Removal, Ex. A (State Court Complaint and Demand for Jury Trial) [Doc. No. 1-1]. Plaintiffs allege that JetBlue's negligence caused personal injury to David Mellor and loss of consortium to Denise Mellor. Id. at ¶¶ 8-9. JetBlue removed to this court, asserting diversity jurisdiction under 28 U.S.C. § 1332. Notice of Removal 1 [Doc. No. 1]. Following discovery, JetBlue filed the pending Motion for Summary Judgment [Doc. No. 41].

## III.  Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if "a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Anderson, 477 U.S. at 256. The non-moving party cannot oppose a

properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Id. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

## IV. Discussion

### A. Standard of Care – Federal Preemption

JetBlue argues that the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 44701, preempts Massachusetts' standard of care for a negligence action relating to inflight hazards subject to FAA safety regulations. Memorandum of Law in Support of Defendant JetBlue Airways Corporation's Motion for Summary Judgment ("Def.'s Mem.") 11-12 [Doc. No. 43] (citing Gill v. JetBlue Airways Corp., 836 F.Supp.2d 33, 44 (D. Mass. 2011)). JetBlue contends further that "compliance with its CAMP Aircraft maintenance program constitutes JetBlue's maintenance of the Aircraft in an airworthy condition in accordance and in compliance with applicable Federal Aviation Regulations with respect to the work performed." Id. at 15; Def.'s SOMF ¶ 13 [Doc. No. 42]. Plaintiffs' expert agrees that "the FAA Act and the Federal Aviation Regulations federal standards of care for aircraft maintenance apply" and determine JetBlue's

negligence, see Def.'s SOMF, Ex. 12 (Deposition of Daniel Allison) 28:9-16 [Doc. No. 42-12], and Plaintiffs concede that this is the standard of care that applies, see Pls.' Resp. Def.'s SOMF ¶ 13 [Doc. No. 47]; see also Abdullah v. American Airlines, 181 F.3d 363, 371 (3d Cir. 1999).

### B.  Breach of the Standard of Care

Instead, Plaintiffs dispute whether JetBlue did, in fact, comply with its CAMP, and assert that evidence in the summary judgment record shows that JetBlue violated the applicable federal standard of care such that the question of JetBlue's compliance should go to a jury. Pls.' Mem. 10-12, 13 [Doc. No. 49]. They point to evidence of repeated hinge detachments leading up to David Mellor's injury, and argue that either the splines were in defective condition—i.e. the tongues of the splines or their locking pins were broken—or the splines were improperly inserted—i.e., not fully engaged in the hinge-locking position—and that, in either case, had JetBlue performed proper maintenance this condition would have been diagnosed and remedied prior to the bin door detaching and injuring Mellor. Plaintiffs contend that the record shows insufficiently specific maintenance log entries and improper certifications of airworthiness by JetBlue mechanics. Id. at 13-17. They further argue that JetBlue's performance of the 750-hour cabin check does not prove compliance. Id. at 18-19.

The court addresses the parties' arguments regarding the 750-hour cabin check and the sufficiency of the maintenance log entries generally before considering the Defect entries involving hinge detachments proffered by the Plaintiffs.

### 1.   750 Hour Cabin Condition Check

Plaintiffs argue that JetBlue cannot demonstrate that it has met the standard of care through compliance with the Cabin Condition Check task card because the card does not require inspection or maintenance of the bin door hinges or splines. Pls.' Mem. 18-19 [Doc. No. 49]. Defendant counters that "it is clearly implicit that the Cabin Condition Check requires an

11

inspection of the overhead bin door male hinge assembly, and of the bin compartment female hinge housing and housing spline, for 'condition and security.'" Def.'s Reply 17 [Doc. No. 50].

The court finds no such implicit requirement. As Defendant's expert explained, the CAMP requirement is for "a periodic <u>visual</u> Cabin Condition Check of all Aircraft overhead bins . . . ." Def.'s SOMF, Ex. 8 (Janco Aff.) ¶ 17 [Doc. No. 42-8] (emphasis added). That this is primarily a visual check is underscored by the heading "Visual Inspection" for the portion of the Cabin Condition Check Task Card concerning the overhead storage compartments. Def.'s SOM, Attachment 5 (Task Card No. A320-25-20-00-200-900-A) [Doc. No. 42-11]. This procedure requires a technician to perform an inspection of the cabin, including checking that the overhead storage compartments unlatch and close properly and the bin doors are in alignment with each other. Def.'s SOMF, Ex. 11 (Task Card No. A320-25-20-00-200-900-A) [Doc. No. 42-11]. The cabin check also requires the technician to inspect the overhead bin doors and compartments for "condition and security." <u>Id.</u> at 6. While Defendant would read that phrase as including the hinges, the procedure continues by focusing on cosmetic issues with the bin and door surfaces, namely "damage such as small holes, dents, or gouges." <u>Id.</u> These instructions underscore that the technician performing the "condition and security check" is to look for cosmetic defects, not to perform a functional inspection. Defendant details many ways that the Cabin Condition Check might prompt a mechanic to inspect a bin door hinge, but the Task Card includes no mention of hinges, let alone splines, and requires only a visual inspection of the storage bins and their doors.

Accordingly, the court agrees with Plaintiffs that the 750 Hour Cabin Condition Check did not require the technician to check the functionality of the spline. Without more, performance of the Cabin Condition Check on January 6, 2018, shows only that JetBlue complied with its

obligation to perform a Visual Inspection of the bin door and storage compartment, but does not

show that the spline was functionally tested or that the condition of the spline was inspected.

       2.     Defect Entries in the Airplane Maintenance Log

           *a.  Sufficiency of the Entries*

Plaintiffs argue that Defect entries in the Airplane Maintenance Log did not comply with

the requirements of JetBlue's maintenance manual and FARs. Pls.' Mem. 15-17 [Doc. No. 49].

JetBlue's manual requires that Defect entries include "a full description of symptoms or

characteristics of the defect including position if applicable" as well as a "description of the

resolved action." Pls.' SOMF, Ex. N (JetBlue Maintenance Forms Manual) 2 [Doc. No. 48-14].

Plaintiffs contend that the descriptions included in the six pre-incident Defect entries provided in

the record are not sufficiently specific to satisfy JetBlue's recording requirements under both its

maintenance manual and 14 C.F.R. § 121.709(b).[10] As a result, Plaintiffs argue that JetBlue

improperly certified the overhead bin doors as airworthy. Pls.' Mem. 17 [Doc. No. 49].

---

[10] 14 C.F.R. § 121.709, titled Airworthiness release or aircraft log entry, provides:

(a) No certificate holder may operate an aircraft after maintenance, preventive maintenance or
alterations are performed on the aircraft unless the certificate holder, or the person with whom
the certificate holder arranges for the performance of the maintenance, preventive maintenance,
or alterations, prepares or causes to be prepared—
    (1) An airworthiness release; or
    (2) An appropriate entry in the aircraft log.
(b) The airworthiness release or log entry required by paragraph (a) of this section
must—
    (1) Be prepared in accordance with the procedures set forth in the certificate holder's
    manual;
    (2) Include a certification that—
        (i) The work was performed in accordance with the requirements of the certificate
        holder's manual;
        (ii) All items required to be inspected were inspected by an authorized person
        who determined that the work was satisfactorily completed;
        (iii) No known condition exists that would make the airplane unairworthy; and
        (iv) So far as the work performed is concerned, the aircraft is in condition for safe
        operation; and

Defendant contends that a Defect entry in an Aircraft Maintenance Log that resolves a bin component defect in accordance with the applicable maintenance manual provision and FARs renders the bin component airworthy. Def.'s Mem. 16 [Doc. No. 43]. Further, in response to Plaintiffs' claim that the Defect entries here were insufficiently specific, JetBlue contends that (a) the entries did comply with the requirements of the maintenance manual, and (b) regardless of their level of detail, "the mechanic's log entry signature certification, in and of itself" is sufficient under § 121.709(e) to show FAR compliance. Def.'s Reply 13 [Doc. No. 50]. Section 121.709(b) details what a maintenance log entry must include and specifies that a log entry must be prepared in accordance with the airline's manual and include a certification that the work was performed in accordance with the manual, that all items required to be inspected were inspected by an authorized mechanic, that no known condition makes the plane unairworthy, and that the aircraft is safe for operation. 14 C.F.R. 121.709(b)(i)-(iv). Section 121.709(e) then provides that "[i]nstead of restating each of the conditions of the certification required by paragraph (b) . . . the air carrier may state in its manual that the signature of an authorized certificated mechanic or repairman constitutes that certification." Id. § 121.709(e).

---

(3) Be signed by an authorized certificated mechanic or repairman except that a certificated repairman may sign the release or entry only for the work for which he is employed and certificated.

(c) Notwithstanding paragraph (b)(3) of this section, after maintenance, preventive maintenance, or alterations performed by a repair station that is located outside the United States, the airworthiness release or log entry required by paragraph (a) of this section may be signed by a person authorized by that repair station.

(d) When an airworthiness release form is prepared the certificate holder must give a copy to the pilot in command and must keep a record thereof for at least 2 months.

(e) Instead of restating each of the conditions of the certification required by paragraph (b) of this section, the air carrier may state in its manual that the signature of an authorized certificated mechanic or repairman constitutes that certification.

JetBlue's maintenance manual contains a section titled "Airworthiness Release and Log Entries: 14 CFR [§ 121.367, § 65.81, § 65.85, § 65.103, §121.709, § 121.380, § 121.563]." Def.'s SOMF, Ex. 6 (General Maintenance Manual) 1 [Doc. No. 42-6]. That section, which references § 121.709 in its title, provides in section 3(b) that "[t]he signature of an authorized and certified Technician in the 'Airworthiness Release' block on the Aircraft Maintenance Log certifies that the aircraft is airworthy and has met [the requirements of § 121.709(b)]." Id. at 2.

Plaintiffs do not dispute the function of a section (e) provision, nor do they dispute that JetBlue's maintenance manual includes the provision. Given JetBlue's inclusion of a section (e) provision in its FAA-approved manual, the court takes the entries in the Airplane Maintenance Log at face value insofar as they specify the defect and the procedures used to address the defect, and finds that where so documented in accordance with JetBlue's maintenance manual, the entries are sufficient to show that such procedures were actually performed and were performed correctly.[11]

Defendant seeks even broader protections, however. Defendant's expert contends that "[w]hen an Aircraft overhead bin component defect is maintained and resolved in accordance with applicable FARs and returned to service as airworthy with respect to the work performed, any previous Aircraft maintenance log bin defect and resolution record is no longer relevant to the airworthy condition of that overhead bin component part." Def.'s SOMF, Ex. 8 (Janco Aff.) ¶ 40 [Doc. No. 42-8]. This may be correct where the exact same defect is identified, and the

---

[11] As detailed by Defendant in its Sur-Reply Memorandum in Support of Motion for Summary Judgment 2-5 [Doc. No. 55], airline mechanics are subject to serious penalties in the event they falsify maintenance records, including fines, suspended privileges, and criminal charges, not to mention the potential human costs of incorrectly or fraudulently certifying a commercial airplane as airworthy. The court credits Defendant's argument that the maintenance records can be trusted as accurate representations of the work that was performed to resolve an incident.

proper procedure is certified to have been used to correct the defect. But if the defects differ, or the certification does not identify the procedure that was used to correct the defect, there is no reason to view the later certificate as superseding an earlier one. Moreover, where a party seeks to establish a pattern of noncompliant certification, all available nonsuperseded maintenance records would be relevant, not just the record immediately predating the subject incident. Requiring courts to turn a blind eye to all but the most recent airworthiness certification would allow airlines to evade liability even where a pattern of noncompliant certification exists.

With that framework, the court turns to the maintenance log entries. The court begins with the Defect entry immediately following the incident which will help clarify which of Plaintiffs' theories are viable, and then proceeds chronologically starting with the oldest Defect entry in the record.

### b. The February 10, 2018 Defect Entry and Plaintiffs' Theories of Hinge Misfunctioning

David Mellor alleges that he was hit by the bin door on the evening of February 9, 2018, and that the flight attendant reattached the bin door prior to landing. Following that flight, at 4:00 a.m. on February 10, the pilot recorded that "bin 3 above DEF needs adjustment." Def.'s SOMF, Ex. 18 (Feb. 10 Air. Maint. Log) [Doc. No. 42-18]. At 9:30 a.m., mechanic James LaRosa recorded that he had "resecured ovhd bin door per MM 25-24-41." Id. Procedure 25-24-41, for installation of an overhead stowage compartment door, requires a mechanic to push a disengaged spline back into its housing and to make sure that the spline is fully engaged by listening for an audible "click." Def.'s SOMF, Ex. 19 (Bin Door Installation Task Card) [Doc. No. 42-19].

During his deposition, LaRosa testified that he could not remember what exactly he had done on February 10, but he was sure that the spline had not been broken, because that would

have required replacement, which in turn would require documentation in a particular box on the Defect entry. Def.'s SOMF, Ex. 20 (Deposition of James LaRosa) 31:2-19 [Doc. No. 42-20].

From the Defect entry and LaRosa's testimony, the record establishes (1) that installation procedure 25-24-41 was performed immediately following the subject incident and (2) the splines were functional and in airworthy condition immediately following the Mellor's flight because LaRosa would have performed the spline check as required by 25-24-41 and replaced the splines if they were broken. This Defect entry therefore negates Plaintiffs' theory that the splines in bin door 3 DEF were broken prior to the incident.

Instead, any negligence on the part of JetBlue must be predicated on Plaintiffs' alternative theory that the splines were not broken but were not fully pushed into their hinge-locked positions, rendering the aircraft not airworthy. See Pls.' Mem. 5 [Doc. No. 49] ("If the locking pin is . . . not engaged in the hinge-locking position, the spline can move out of the hinge . . . . If it moves out a small distance, the hinge components become loose and can detach . . . . If the locking pin is not in the hinge-locking position, the bin door can detach and injure a passenger.").

###### c.   The Defect Entries Preceding the Incident

Plaintiffs are alleging that JetBlue negligently failed, through improper maintenance, to identify and repair a defective or malfunctioning spline, which caused an overhead bin door to detach from its hinge and hit David Mellor. Both sides agree that the only maintenance procedure this court has been provided that involves checking a spline's condition and ensuring that it is effectively locked is the installation procedure in section 25-24-41. And, based on the record, the only event that would require an installation procedure is a bin door detachment.

The pilot's entry for July 30, 2017, reports "Bin door . . . is off the track" and the maintenance provider detailed resolution as "secured overhead bin as required Ops. CHK Good.

A/C ok for SVC." Pls.' SOMF, Ex. A (Air. Maint. Log) 2 [Doc. No. 48-1]. It is not clear from this entry whether this event involved the bin hinges at all. Nor is there reason to believe that the mechanics should have performed an installation, as opposed to adjustment, procedure. As such, on this record, the entry does not further Plaintiffs' claim of negligence (or support JetBlue's contention that the hinges had been determined to be in good working order based on that entry).

The Defect entry for August 26, 2017, starts with the pilot's report that "Overhead bin door 3DEF fell off," the immediate action as " . . . reinstalled door and secured closed" under AMM 25-28,[12] and entry of a deferral code. Id. at 3. Later that same day, further action was initiated by maintenance for the 3DEF overhead bin, and the resolution was logged as "adj[usted] overhead bin door" with the mechanic recording the JetBlue aviation maintenance manual code as AMM 25-24-00. Id. at 4. But AMM 25-24-00, the adjustment procedure, entails ensuring the doors are properly aligned by loosening or tightening the hinge screws or inserting shim plates. The adjustment procedure does not mention door detachment or installation, or splines. As such, a jury could find the first Defect entry from that date to be evidence that: (1) the bin door had previously detached six months before the incident and (2) the installation that occurred initially did not follow the installation procedures at 25-24-41, and could find that the second entry from that date shows that the mechanic addressed an adjustment issue, and therefore also did not follow the installation procedures at 25-24-41.

On October 3, 2017, the pilot reported "bin 3 (ac right) broken," and on December 9, 2017, the pilot reported "bin door 3 row right side came loose." Id. at 5-6. As with the July entry, "broken" does little to illuminate the nature of the defect, particularly since no broken parts were

---

[12] This section of JetBlue's maintenance manual was not provided to the court by either party and is not included in the record. Without it, the court cannot determine whether the action pursuant to that section is relevant to case at hand.

replaced, and "came loose" could just mean that the screws attaching the hinges needed to be tightened, not that the door had detached. Maintenance providers detailed the resolutions, however, as "resecured the bin at row 3 DEF as required" in the October Defect entry, id. at 5, and as "re-attached overhead bin door above 3DEF as required, op ck good," in the December Defect entry, id. at 6. Giving Plaintiffs all reasonable inferences, the term "resecured" and "re-attached" can be read to mean that the bin door needed to be (and was then) reattached. And although the entries assert that the repair was "as required," the maintenance providers included no details as to which procedure was used. As such, a jury could find these two entries to be evidence that: (1) the bin door had detached a second and third time during the six months before the incident and (2) the installation that occurred did not necessarily follow the installation procedures at 25-24-41.

On December 19, 2017, the pilot reported "hinge for door panel on overhead cabin bn above passenger seats row 3 & row 4 is detached" and on December 30, 2017, the pilot reported "overhead bin over 3 DEF fell off hinge." Id. at 7. Like the August 26, 2017 report, the identified defect required a door installation. The maintenance provider addressing the first December incident recorded the resolution as "resecured bin door latch @ row 3-4 R/H Side – ops checks good," without citing a provision of the maintenance manual. Id. The mechanic addressing the second December incident, recorded the resolution as "overhead bin resecured," citing AMM code 25-24-00, which as noted above, makes no mention of door installations or splines. Id. From this, a jury could find these two entries to be evidence that: (1) the bin door had detached a fourth and fifth time during the six months before the incident and (2) the first December installation did not necessarily follow the installation procedures at 25-24-41 and the second December installation did not follow those procedures.

A jury could thus find based on these entries that (1) on up to five occasions, the bin door above row 3 DEF detached from the bin compartment and (2) on none of the five occasions did the maintenance worker document using the procedure that was needed to confirm that the spline was fully seated and locked. Instead, the Defect entries—where they document what procedure was performed at all—establish that JetBlue's mechanics performed adjustment procedures (which include steps such as tightening the screws). The question of whether it was negligent for JetBlue, when faced with repeated incidents of a bin door detaching from its bin compartment, to perform maintenance actions that did not involve checking functional components of the bin door hinge, is one that should be left to a jury.

Accordingly, the court finds that the question of whether JetBlue was negligent is one of material fact and summary judgment is inappropriate.

## V.      Conclusion

For the foregoing reasons, JetBlue's Motion for Summary Judgment [Doc. No. 41] is DENIED.

IT IS SO ORDERED.

September 29, 2023                              /s/Indira Talwani_____
                                               United States District Judge